## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAVITA FISCHER, MD, | |
| Plaintiff, | Civil Action No.: _____--_____ |
| v. | |
| DRAFTKINGS, INC., | **COMPLAINT** |
| Defendant. | |

Plaintiff Kavita Fischer, MD, ("Dr. Fischer" or "Plaintiff") by way of a Complaint by and through her attorney Litt Law, LLC against the defendants DraftKings, Inc., John/Jane Doe(s) 1-10, and ABC Corporation(s) 1-10, (Collectively "Defendant") does hereby state:

<u>INTRODUCTION</u>

Dr. Fischer is and was at all times relevant an accomplished, respected, double board-certified psychiatrist. The Plaintiff was also an addicted gambler, and was known by Defendant DraftKings, Inc. ("DraftKings") to be an addicted gambler. DraftKings knew Dr. Fischer was an addicted gambler through the data it kept and monitored on her gambling activity and constant contact with her through its VIP host, all of which showed her to be an addicted gambler.

As a result of Dr. Fischer's gambling activity, DraftKings "upgraded" Plaintiff to its VIP program, which includes a dedicated VIP host. The VIP program is calculated and operated by DraftKings to initiate, sustain, and exacerbate the gambling addiction of problem gamblers by providing relentless enticements to continue and escalate deposits and betting activity through the dedicated VIP host.

Moreover, the Defendant's dedicated VIP host Jamyl Cogdell was in constant communication with Dr. Fischer, through which Dr. Fischer displayed countless hallmark signs of problem gambling, including asking Defendant DraftKings for a loan to pay her mortgage. Defendants even acknowledged that Plaintiff was displaying signs of problem gambling and asked her if she needed help -- then continued providing incentives to deposit and gamble while awaiting her response.

To be clear, this suit does not allege liability on the basis that DraftKings passively permitted an addicted gambler to use its platform. Rather, this suit alleges intentional tortious acts because Defendant actively and intentionally targeted and preyed on Plaintiff with incentives, credits, and gifts to create, nurture, expedite, and/or exacerbate her addiction despite and/or because of their knowledge of her addiction.

## FACTS RELEVANT TO ALL COUNTS

### Gambling Addiction

1.      Dr. Fischer was, and exhibited the fundamental symptoms of being, a problem gambler, also referred to herein as gambling addiction, compulsive gambling, or gambling disorder.

2.      Gambling disorder is classified by both the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5-TR") and World Health Organization's International Classification of Diseases as an addictive disorder, alongside alcohol, opioid, hallucinogen, sedative, stimulant, and tobacco use disorders.

3.      At all times relevant to this Complaint, the Defendant recognized the nature and symptoms of problem gambling behavior through experience and training.

4.      At all times relevant to this Complaint, VIP host Jamyl Cogdell recognized the nature and symptoms of problem gambling behavior through experience and training.

5.      At all times relevant to this Complaint, DraftKings knew that its VIP program was dangerous and would initiate, sustain, and exacerbate addiction for problem gamblers.

6.      At all times relevant, Kavita Fischer showed clear and multiple symptoms of problem gambling to DraftKings through her deposits, gambling, and communication with DraftKings.

7.      At all times relevant to this Complaint, DraftKings knew that Kavita Fischer was a problem gambler.

**DraftKings' Collection, Active Monitoring, and Use of Customer Data**

8.      At all times relevant, Defendant cultivated and actively monitored and utilized vast quantities of data on its customers ("Data"), including Dr. Fischer.

9.      The Data showed, and among many other things: a) how much money was deposited onto their platform on a daily basis, b) how many bets were placed on a daily basis, and c) how much money was lost on a daily basis (collectively "Data").

10.     At all times relevant, Defendants cultivated and actively monitored and used vast quantities of Data on Dr. Fischer showing, and among many other things: a) how much money she deposited onto Defendant's platform on a daily basis, b) how many bets she placed on a daily basis, and c) how much money she lost on a daily basis.

11.     The Data showed Defendants that its product was causing and/or exacerbating Dr. Fischer's gambling addiction.

12.     Defendant knew that its product was dangerous and initiating, sustaining, and/or exacerbating Dr. Fischer's addiction.

13.     Defendant knew Dr. Fischer was an addicted gambler because they actively monitored her Data.

14.     The Data kept on Dr. Fischer showed Defendant that she was depositing and gambling money in exponentially escalating amounts and betting with an exponentially escalating frequency.

15.     DraftKings never performed a verification of Dr. Fischer's source of funds to confirm the amounts they were causing her to deposit were within her means.

16.     DraftKings knew that it should perform a verification of Dr. Fischer's source of funds to confirm that the amounts they were causing her to deposit were within her means.

17.     DraftKings intentionally avoided verifying Dr. Fischer's source of funds because it knew that the amounts of deposits were not within her means.

18.     Defendants knew Dr. Fischer was an addicted gambler because its Data showed exponential growth in the deposits, frequency, and in amounts and frequencies which only an addicted gambler could deposit and gamble.

19.     The amounts and frequency of Dr. Fischer's deposits and betting activity grew exponentially as the proximate and foreseeable result of the incentives, gifts, bonuses, and awards given by DraftKings' VIP program.

**Exponential Increase in Deposits Resulting From VIP Program**

20.     Dr. Fischer was "upgraded" into DraftKings' VIP program on December 8, 2022.

21.    Dr. Fischer was introduced to the VIP program's VIP host Jamyl Cogdell the next day, December 9, 2022.

22.    The Defendant kept and monitored data on Dr. Fischer showing DraftKings that she made 446 deposits in less than four months between January 1, 2023 and April 29, 2023.

23.    The Defendant kept and monitored data on Dr. Fischer showing DraftKings she deposited $208,130.50 between January 1, 2023 and April 29, 2023, and had lost $153,412.51.

24.    The Defendant kept and monitored data on Dr. Fischer showing DraftKings she placed 60,327 casino bets in the four months between January 1, 2023 and April 29, 2023.

25.    The Defendant kept and monitored data on Dr. Fischer showing DraftKings she made 22 separate deposits on February 13, 2023 totaling $14,950 in just under four hours between 7:54pm and 11:50pm.

26.    DraftKings knew that 22 separate deposits totaling $14,950 in under four hours was a sign of problem gambling.

27.    The incentives, enticements, gifts, and communications from DraftKings VIP program was the cause, in whole or in part, of Dr. Fischer's 22 separate deposits totaling $14,950 between 8:08pm and 11:50pm.

28.    The Defendant kept and monitored data on Dr. Fischer showing DraftKings that just one day later, she made 27 separate deposits on February 14, 2023 totaling $25,000 between the hours of 3:47am and 4:44pm.

29.    DraftKings knew that 27 separate deposits totaling $25,000 the day after making 22 separate deposits totaling $14,950 was a sign of problem gambling.

30.    The incentives, enticements, gifts, and communications from DraftKings VIP program was the cause, in whole or in part, of Dr. Fischer's 27 separate deposits totaling $25,000 the day after making 22 separate deposits totaling $14,950.

31.    The Defendant kept and monitored data on Dr. Fischer showing DraftKings that she made 8 separate deposits on the next day, February 15, 2023, totaling $10,000 in a little more than an hour between 7:52am and 5:59pm.

32.    DraftKings knew that 8 separate deposits totaling $10,000 in a little more than an hour the day after making 27 deposits in the amount of $25,000 and two days after making 22 deposits in the amount of $14,950 was a sign of problem gambling.

33.    The incentives, enticements, gifts, and communications from DraftKings VIP program were the cause, in whole or in part, of Dr. Fischer making 8 separate deposits totaling $10,000 on February 15, 2023 in a little more than an hour the day after making 27 deposits in the amount of $25,000 and two days after making 22 deposits in the amount of $14,950.

34.     The Defendant kept and monitored data on Dr. Fischer showing DraftKings that she made 30 separate deposits on the next day, February 16, 2023, totaling $13,151 between 12:40am and 10:19pm.

35.    DraftKings knew that 30 separate deposits totaling $13,151 the day after making 8 deposits in the amount of $10,000, two days after making 27 deposits in the amount of $25,000, and three days after making 22 deposits in the amount of $14,950 was a sign of problem gambling.

36.    The incentives, enticements, gifts, and communications from DraftKings VIP program were the cause, in whole or in part, of Dr. Fischer making 30 separate deposits totaling $13,151 on February 16, 2023 the day after making 8 deposits in the amount of $10,000, two days after

making 27 deposits in the amount of $25,000, and three days after making 22 deposits in the amount of $14,950.

37.    The Defendant kept and monitored data on Dr. Fischer showing DraftKings that she made 39 separate deposits on the next day, February 17, 2023, totaling $13,445 between 12:01am and 10:05pm.

38.    DraftKings knew that 39 separate deposits totaling $13,445 the day after making 30 separate deposits totaling $13,151, two days after making 8 deposits in the amount of $10,000, three days after making 27 deposits in the amount of $25,000, and four days after making 22 deposits in the amount of $14,950 was a sign of problem gambling.

39.    The incentives, enticements, gifts, and communications from DraftKings VIP program were the cause, in whole or in part, of Dr. Fischer making 39 separate deposits totaling $13,445 on February 17, 2023 the day after making 30 separate deposits totaling $13,151, two days after making 8 deposits in the amount of $10,000, three days after making 27 deposits in the amount of $25,000, and four days after making 22 deposits in the amount of $14,950.

40.    The Defendant kept and monitored data on Dr. Fischer showing DraftKings that she made 23 separate deposits on the next day, February 18, 2023, totaling $3,206 between 2:21am and 5:57pm.

41.    DraftKings knew that 23 separate deposits totaling $3,206 the day after making 39 separate deposits totaling $13,445, two days after 30 separate deposits totaling $13,151, three days after making 8 deposits in the amount of $10,000, four days after making 27 deposits in the amount of $25,000, and five days after making 22 deposits in the amount of $14,950 was a sign of problem gambling.

42.    The incentives, enticements, gifts, and communications from DraftKings VIP program were the cause, in whole or in part, of Dr. Fischer making 23 separate deposits totaling $3,206 the day after making 39 separate deposits totaling $13,445, two days after 30 separate deposits totaling $13,151, three days after making 8 deposits in the amount of $10,000, four days after making 25 deposits in the amount of $25,000, and five days after making 22 deposits in the amount of $14,950.

43.    Dr. Fischer made 147 deposits for a total of $79,752 in just six days between February 13 and 18.

44.    DraftKings knew that Dr. Fischer had never deposited at this frequency or in these amounts prior to her being "upgraded" to its VIP program.

45.    DraftKings' VIP program was calculated to have problem gamblers, including Dr. Fischer, deposit money in increasing frequencies and higher amounts.

46.    DraftKings knew that Dr. Fischer's deposits between February 13 and February 18 were a sign of problem gambling.

47.    Dr. Fischer's deposits of $79,752 between February 13 and February 18 were far above her means, and caused her severe financial damage and emotional distress.

48.     DraftKings knew or should have known that Dr. Fischer's deposits of $79,752 between February 13 and February 18 were far above her means and would cause her severe financial damage and emotional distress.

49.    On February 18, 2023, Dr. Fischer placed herself on a temporary self-exclusion from the Defendant's gambling platform.

50.    DraftKings was aware of the temporary self-exclusion.

51.    On February 26, 2023, the day her self-exclusion ended, the data kept and monitored by Defendants showed DraftKings that Dr. Fischer made 9 deposits in the amount of $4,525 in less than a half an hour, between 2:03pm and 2:30pm.

52.    The data kept and monitored by Defendants showed DraftKings that on February 27, 2023, just two days after her self-exclusion ended, Dr. Fischer made 24 deposits in the amount of $13,975 between 12:44am and 10:55pm.

53.    The data kept and monitored by Defendants showed DraftKings that on February 28, 2023, just three days after her self-exclusion ended, Dr. Fischer made 19 deposits in the amount of $9,698.

54.    The data kept and monitored by Defendants showed DraftKings that on March 1, 2023, just four days after her self-exclusion ended, Dr. Fischer made 10 deposits in the amount of $1,315.

55.    The data kept and monitored by Defendants showed DraftKings that on March 2, 2023, just five days after her self-exclusion ended, Dr. Fischer made 5 deposits in the amount of $584.

56.    The data kept and monitored by Defendants showed DraftKings that on March 3, 2023, just six days after her self-exclusion ended, Dr. Fischer made 15 deposits in the amount of $4,450.

57.    On March 3, 2023, just six days after her self-exclusion ended, DraftKings incentivized Dr. Fischer with an "Exclusive Casino Bonus."

58.    The data kept and monitored by Defendants showed DraftKings that on March 4, 2023, just seven days after her self-exclusion ended, Dr. Fischer made 5 deposits in the amount of $380.

59.     The data kept and monitored by Defendants showed DraftKings that on March 5, 2023, just eight days after her self-exclusion ended, Dr. Fischer made 4 deposits in the amount of $1,000.

60.     The data kept and monitored by Defendants showed DraftKings that on March 6, 2023, just nine days after her self-exclusion ended, Dr. Fischer made 24 deposits in the amount of $5,661.

61.     On March 6, 2023, just nine days after her self-exclusion ended, DraftKings incentivized Dr. Fischer with the message: "You've earned an exclusive tier reached gift. Claim your gift and celebrate Diamond Tier Status in style."

62.     Later in the same day, March 6, 2023, DraftKings further incentivized Dr. Fischer with the message: "Don't blink and miss your chance at up to $2,500! Opt-in and receive up to $2,500 in Casino Credits when you wager on eligible Casino games…"

63.     The promotion in the immediately preceding paragraph required Dr. Fischer to wager quickly, before the end of March 8, 2023; also that same day, Dr. Fischer received an reminder email for complimentary tickets to the Penguins vs. Islands NHL game.

64.     The data kept and monitored by Defendants showed DraftKings that on March 7, 2023, just ten days after her self-exclusion ended, Dr. Fischer made 6 deposits in the amount of $1,025.

65.     Dr. Fischer made 121 deposits for a total of $42,613 in the ten days immediately following her self-exclusion.

66.     DraftKings' VIP program was calculated to have problem gamblers, including Dr. Fischer, deposit money in frequencies and amounts following a period of self-exclusion which continued and exacerbated the problem gambler's addiction.

67.    DraftKings knew that Dr. Fischer's 121 deposits in the amount of $42,613 in the ten days immediately following her self-exclusion were a sign of problem gambling.

68.    Dr. Fischer's 121 deposits in the amount of $42,613 in the ten days immediately following her self-exclusion were far above her means, and caused her severe financial damage and emotional distress.

69.    DraftKings knew or should have known that Dr. Fischer's 121 deposits in the amount of $42,613 in the ten days immediately following her self-exclusion were far above her means, and caused her severe financial damage and emotional distress.

70.    On March 9, 2023, less than two weeks after the end of her self-exclusion, DraftKings provided Dr. Fischer with four emails incentivizing her by providing "free" credits and an incentive to deposit and gamble in greater amounts through an "exclusive slots lossback offer."

71.    On March 10, 2023, the very next day, Dr. Fischer made 15 deposits in the amount of $4,200.

72.    On March 11, 2023, Dr. Fischer made 4 deposits in the amount of $2,550.

73.    Between March 12, 2023 and March 25, 2023, DraftKings saw that Dr. Fischer was depositing significantly less money, exceeding $1,000 only once.

74.    On March 13, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through a series of three emails offering casino credits, $1,250,000 in prizes, and a separate $100,000 prize with her "Diamond Tier exclusive offer."

75.    On March 15, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through a series of emails providing her with "free" casino credits.

76.    On March 16, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through email enticing her to "earn" between 25,000 and 2,500,000 DraftKings points by betting on its casino games.

77.    On March 18, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through email offering a "Promo Pack" filled with bonuses which "rewarded" her for depositing and gambling more money.

78.    On March 20, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through an email allowing her to "earn" up to $3,000 in casino credits if she "completed the wagering requirements."

79.    On March 22, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through email offering a "mystery reward" if she gambled more than $12,000 within a specified and short timeframe.

80.    On March 24, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through a series of emails offering a chance to "earn" casino credits if she gambled a certain amount, offering her a prize of a custom jacket, and a $10 casino credit for every $100 she gambled.

81.    On March 25, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through email providing her with a $20 credit.

82.    On March 26, 2023, DraftKings incentivized Dr. Fischer to again deposit and gamble more money through email providing her with a second $20 credit.

83.    On March 26, 2023, Dr. Fischer made 5 deposits in the amount of $2,995.

84.    On March 27, 2023, DraftKings incentivized Dr. Fischer to deposit and gamble more money through an offer for free casino credit.

85.    On March 28, 2023, DraftKings sent Dr. Fischer an email reminding her to practice safe betting.

86.    Later that same day, March 28, 2023, DraftKings sent Dr. Fischer two separate emails offering free credits to continue betting.

87.    On March 28, 2023, Dr. Fischer made 3 deposits in the amount of $2,000.

88.    On March 29, 2023, DraftKings again sent Dr. Fischer two separate emails with free credits to continue betting.

89.    On March 29, 2023, Dr. Fischer placed herself into another self-exclusion period.

90.    An email from DraftKings sent on April 24, 2023 reminded Dr. Fischer that the period ended precisely at 11:59pm on April 26, 2023.

91.    On April 27, 2023 at 1:23am, Dr. Fischer made her first of three deposits on that day totaling $6,775.

92.    On April 28, 2023, the data kept and monitored by DraftKings showed Defendant that Dr. Fischer made 25 deposits in the total amount of $5,575 just one day after the end of her self-exclusion.

93.    The emails sent by DraftKings to Dr. Fischer was calculated to entice problem gamblers, including Dr. Fischer, to deposit money in frequencies and amounts which initiated, sustained and/or exacerbated the problem gambler's addiction.

94.    DraftKings knew that the emails sent to Dr. Fischer were, in fact, initiating, sustaining and/or exacerbating her gambling addiction.

95.    Dr. Fischer's deposits in the total amount of $208,130.50 between January 1, 2023 and April 29, 2023 were far above her means, and caused her severe financial emotional distress.

96.     DraftKings knew or should have known that Dr. Fischer's deposits of $208,130.50 between January 1, 2023 and April 29, 2023 were far above her means and would cause her severe financial damage and emotional distress.

### DraftKings' Knowledge of Dr. Fischer's Addiction Through Direct Communication with its VIP Host

97.     On December 9, 2022, Jamyl Cogdell, an employee of DraftKings, introduced himself to Dr. Fischer as her new "Player Development Executive."

98.     DraftKings immediately began grooming Dr. Fischer in the initial email, offering her "free" casino credit if she responded to his email.

99.     In an email on December 12, 2022, Dr. Fischer complained to Cogdell about her self-imposed $40,000 monthly deposit limit.

100.     Defendant knew, through training and/or experience, that a complaint about a $40,000 monthly deposit limit was a sign that Dr. Fischer was a problem gambler and/or vulnerable to gambling addiction.

101.     Cogdell responded to Dr. Fischer's email by instructing her how to bypass the deposit limit: "…you can change (the limit) on 12-26 at 11:08:50pm."

102.     In the same email, Cogdell offered Dr. Fischer a $1,000 DraftKings credit.

103.     On January 3, 2023, DraftKings offered Dr. Fischer free tickets to a National Football League game in the Defendant's suite, including exclusive pregame field passes. This was in addition to other prizes including, but not necessarily limited to: a tent, winter jacket, winter vest, socks, blanket Steelers hats and mugs, and Amazon gift card.

104.     On January 9, 2023, Dr. Fischer sent Cogdell an email saying she "should probably use (her) rational brain and switch to a table game or quit gambling completely," while at the same time asking for "some VIP love based on (her) donations to DK this year."

105.    DraftKings knew that this email was a sign that Dr. Fischer was a problem gambler and/or vulnerable to gambling addiction.

106.    DraftKings subsequently gave Dr. Fischer $500 in casino credits later that same day.


### DraftKings' "Commitment to Responsible Gambling"


107.    On March 21, 2023, Dr. Fischer sent DraftKings an email asking for a loan because she was unable to pay her mortgage. The email also says: "Probably means I need to quit gambling soon also."

108.    Later that same day, March 21, 2023, DraftKings sent an email through its VIP host Cogdell, asking "I want to check in with you, are you still playing within your means/budget? We take responsible gambling very seriously here, and never want someone to be playing outside there (sic) comfort zone. Ensuring everyone is engaging in safe and responsible play is my number one priority."

109.    DraftKings knew that an email asking for a loan to pay her mortgage and stating that she should quit gambling was a sign that Dr. Fischer was a problem gambler and/or vulnerable to gambling addiction.

110.    Despite Dr. Fischer's email and its stated commitment to responsible gambling, DraftKings sent emails to Dr. Fischer on: a) March 22, 2023 b) March 24, 2023 at 2:58pm, c) March 24, 2023 at 4:00pm, d) March 24, 2023 at 5:30pm, e) March 25, 2023 f) and March 26, 2023, all containing enticements to continue and raise her deposits and gambling.

111.    The emails sent by DraftKings to Dr. Fischer were calculated to entice problem gamblers, including Dr. Fischer, to deposit money in frequencies and amounts which initiated, sustained and/or exacerbated the problem gambler's addiction.

112.    DraftKings knew that the emails sent to Dr. Fischer were, in fact, initiating, sustaining and/or exacerbating her gambling addiction.

113.    On March 27, 2023, Dr. Fischer responded to Cogdell's March 21 email, answering that she was playing within her means.

114.    DraftKings knew or should have known that asking a problem gambler whether they are a problem gambler is a wholly ineffective method for determining whether someone is a problem gambler.

115.    DraftKings' "responsible gambling" protocol was intentionally ineffective to keep problem gamblers, including Dr. Fischer, depositing and gambling.

116.    Cogdell was instructed and/or incentivized by Defendant to extract as much money from gamblers, including Dr. Fischer, as possible.

117.    Cogdell was instructed and/or incentivized by Defendant to ignore the symptoms of problem gambling behavior exhibited by Defendant's customers, including Dr. Fischer.

118.    Cogdell did, in fact, ignore the symptoms of problem gambling behavior exhibited by Dr. Fischer.

119.    Defendant knew that Dr. Fischer was an addicted gambler because they monitored data on Dr. Fischer and engaged with her through text messages, telephone, and email on a regular basis.

120.    Through its VIP program and VIP host, Defendant created, nurtured, expedited, and/or exacerbated the addiction of Dr. Fischer by offering her incentives including free bets, loss-back

credits, event tickets, gifts, and other incentives to manipulate her to deposit money and gamble at levels far beyond her means.

121.    These incentives were calculated to result in Dr. Fischer depositing money and gambling at levels far beyond her means.

122.    These incentives did, in fact, result in Dr. Fischer depositing money and gambling at levels far beyond her means.

123.    Many of the communications from the Defendant perversely "congratulate" Dr. Fischer for depositing money and gambling at levels far beyond her means.

124.    These communications were calculated to result in Dr. Fischer depositing money and gambling at levels far beyond her means.

125.    These communications did, in fact, result in Dr. Fischer depositing money and gambling at levels far beyond her means.

126.    Defendants intentionally exploited the gambling addiction of Dr. Fischer to the detriment of the Plaintiff, and to its own benefit.

127.    At all times relevant, Cogdell and his supervisor(s) recognized the nature and symptoms of problem gambling behavior through experience and/or training, and knew how to assist players who struggled with a gambling problem.

128.    Defendant at all times relevant monitored the amounts of money Dr. Fischer deposited and gambled, and actively enticed and manipulated her to deposit and gamble in exponentially higher amounts.

129.    The frequency and amounts of deposits and bet made by Dr. Fischer were known by Defendant to be a fundamental and visible symptom of problem gambling.

130.    The communications made by Dr. Fischer were known by Defendant to be a fundamental and visible symptom of problem gambling.

131.    Dr. Fischer was vulnerable to enticements to gamble because she was a compulsive gambler.

132.    Defendants knew that Dr. Fischer was vulnerable to enticements to gamble because he was a compulsive gambler.

133.    The enticements to gamble given to Dr. Fischer by the Defendants were provided with the intent to create, nurture, expedite, and/or exacerbate her gambling addiction.

134.    The Defendant's enticements to gamble had the effect of creating, nurturing, expediting, and/or exacerbating Dr. Fischer's gambling addiction.

135.    The Defendant made enticements to deposit and gamble to Dr. Fischer because she was known by them to be a compulsive gambler, and/or exhibited symptoms of gambling addiction.

136.    The Defendant made enticements to gamble to Dr. Fischer despite knowing she was a problem gambler and/or exhibited symptoms of problem gambling.

137.    The Defendant's creation, nurturing, expediting, and/or exacerbation of the gambling addiction of Dr. Fischer was the proximate cause, in whole or in part, of damages to the Plaintiff including, but not necessarily limited to, pecuniary losses in an ascertainable and precise amount to be determined at trial, inclusive of monies lost, plus related emotional distress.

138.    The Defendant's intentional use of its product in a harmful manner constitutes the tort of common-law intentional negligence.

139.    The Defendant's negligent use of its product in a harmful manner constitutes the tort of common-law negligence.

## PARTIES

140.    Plaintiff Kavita Fischer, MD is an individual residing in the State of Pennsylvania, Township of Mt. Lebanon.

141.    DraftKings, Inc. is a publicly-traded online sports and casino betting company with an office located at 11 Park Place, New York, NY 10007 from which DraftKings, Inc.'s Marketing, Business Development, Analytics, and Operations teams work.

142.    John/Jane Does 1-10 are individuals whose identities are presently unknown to Plaintiff, but are responsible for all or part of the acts and omissions complained of herein.

143.    ABC Corporations 1-10 are entities whose identities are presently unknown to Plaintiff, but are responsible for all or part of the acts and omissions complained of herein.

## JURISDICTION AND VENUE

144.    The District Court has original jurisdiction over the instant civil matter pursuant to 28 U.S.C. § 1332 (a)(1) and (2) because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and is between citizens of different States.

145.    Venue in the Southern District of New York is appropriate pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events and omissions giving rise to the claims occurred at the New York, New York office of DraftKings, Inc., and because Defendant DraftKings, Inc. is subject to the court's personal jurisdiction.

146.    Venue in the Southern District of New York is further appropriate pursuant to 28 U.S.C. § 1391(d) because the contacts of DraftKings, Inc. are sufficient to subject it to personal jurisdiction if the Southern District of New York were a separate state.

## FIRST COUNT
### Negligence

147.    Plaintiff hereby incorporates and restates the allegations contained in all previous paragraphs as if set forth again at full length herein.

148.    The Defendant owed Plaintiff a duty of care.

149.    Defendant breached its duty of care to Dr. Fischer by targeting her for its VIP program, including making ongoing inducements to Plaintiff to gamble while Defendant knew or should have known that Dr. Fischer was a compulsive gambler.

150.    Defendant breached its duty of care to the Plaintiff by subjecting her to its VIP program, including initiating a series of enticements to Dr. Fischer to gamble which Defendants knew or should have known would have the effect of creating, nurturing, expediting, and/or exacerbating her problem gambling.

151.    The Defendant's breach(s) of its duty(s) of care was an actual and proximate cause of Dr. Fischer's actual damages.

152.    The Defendant's negligence was intentional, and done with a wanton and willful disregard of persons who foreseeably might be harmed by their acts, such as Plaintiff.

WHEREFORE, the Plaintiff demands judgment against the Defendant for: a) compensatory damages and b) punitive damages, together with c) interest, costs of suit, and such further and other relief as this Court deems just and equitable.

## SECOND COUNT
### Intentional Infliction of Emotional Distress

153.    Plaintiff hereby incorporates and restates the allegations contained in all previous paragraphs as if set forth again at full length herein.

154.   The conduct of the Defendant as described herein was intentional and reckless.

155.   The conduct of the Defendant as described herein was extreme and outrageous, and goes beyond all bounds of decency and is intolerable in a civilized community.

156.   The conduct of the Defendant caused the Plaintiff to suffer severe emotional distress.

157.   The Plaintiff's severe emotional distress was the foreseeable result of the Defendant's acts.

WHEREFORE, the Plaintiff demands judgment against the Defendants in an amount to be determined at trial for: a) compensatory damages, b) punitive damages, together with c) interest, costs of suit, and such further and other relief as this Court deems just and equitable.

Dated: February 12, 2025

**LITT LAW, LLC**

By:    Matthew R. Litt, Esq.

Mailing address:
789 Farnsworth Avenue
Bordentown, New Jersey 08505
Phone: (908) 902-7071
MLitt@LittLaw.Net